## RAILROAD LAW—NEGLIGENCE.

2 Dec.
522

[Lucas County Circuit Court, January 14, 1895.]

†THE LAKE SHORE AND MICHIGAN SOUTHERN RAILWAY COMPANY v. EDWARD L. TOPLIFF.

1. DUTY OF RAILROAD COMPANY TO PROVIDE RULES FOR PROTECTION OF ITS EMPLOYEES.

During the progress of the work of repairing or altering railway tracks, by which said tracks are made dangerous, it is the duty of the railway company to provide rules and regulations for the control and protection of employees and for the protection of the public against dangers consequent upon such work or the temporary condition of such tracks.

2. SAME—SECURING CARS ON SIDING.

Where railway tracks, when finished, and constituting a siding, stand upon an inclined plane, it is the duty of the company to provide rules and regulations to secure the cars which are placed upon such tracks from getting out onto the main line.

3. MEASURE OF DAMAGES.

Verdict of $19 000 not excessive considering the earning capacity of the person who was injured, and the sufferings he had to endure; a verdict of $19,000 is not so excessive as to warrant the court in interfering with it.

HAYNES, J.

A petition in error was filed in this case for the purpose of reversing the judgment of the court of common pleas and setting aside a verdict which had been rendered by a jury in the court below in favor of the plaintiff and against the defendant.

The record shows that on the 16th of July, 1892, the defendant in error, Edward L. Topliff, left the depot at this place, on the Lake Shore & Michigan Southern Railroad, as engineer in charge of a locomotive attached to a fast limited train, which left here at 11:55 P. M. bound for Cleveland—a train that was making some forty or more miles an hour, running in the regular course of its schedule. Topliff was then 43 years of age; had been in the employ of the company about 28 years, and was admitted by the company to be among its best engineers. The train proceeded on its way—the night being somewhat dark, and no moon, I believe—until it arrived at Vermillion. As you approach Vermillion there is a

---

†The judgment in this case was affirmed by the supreme court, without report, 53 O. S., 679.

L. S. & M. S. Ry. Co. v. Topliff.

curve in the road some few hundred feet, and as the train approached the curve the engineer slackened the speed of the train, as required by the rules of the company, so that it was then running at a less rate of speed than when in the open country. As the train came around this curve and came down the track towards the depot, Topliff suddenly saw, within the range of the headlight of his locomotive, a car standing upon the track, which was in fact a car loaded with coal. It was too late for him to do anything in the way of stopping the train, and in the next moment the locomotive had struck that car with tremendous force and driven the car, or cars, down the track, turning the locomotive about so that it was headed west, turned it on its side and bringing the tender back upon it. Underneath this mass Topliff was buried; and when he was finally taken out it was found that the locomotive, or some part of the machinery, had fallen on his body and crushed the pelvic bones and inflicted injuries from which he not only suffered then, but which are permanent in their nature and which will disable him during all of his life. He is now unable to rise or stand without aid, or to walk.

Turning to the situation at that point of the tracks, there were at Vermillion two main tracks running east and west, and, upon the northerly side, there were two side tracks, two thousand feet in length, one known as No. 1 and the other as No. 2. The company were at that time changing the tracks somewhat upon the road at that point, and were changing the location of this northerly side track, and they had caused to be excavated—for there was a little bank there—a place for the No. 2 track some feet north of where it had originally been placed. This grading had been so far finished at least, that on the 14th of July, two days previous to the accident, the foreman of the local gang of men had moved the track over from its original position to this grade. In doing that the track had been cut into two sections near the center and had been removed then by the means of bars and other appliances, to the line of track and placed upon the ties—the ties being placed, as I understand, above the surface or on the surface of the ground. Subsequent to this, or during the next two days, the foreman was engaged in smoothing down or finishing a wagon track which was in part between the two tracks—they had removed the track over upon the wagon track which had been there before. Subsequent to that, this same foreman had, as he says, lowered the grade of the track. I think from the evidence he means that he had sunk the ties into the ground and had leveled up and adjusted and conformed the track to the grade which had been established. As you approach the depot at Vermillion the track rises—as you approach it from the west; and as you pass east from the depot the track falls so there is a slight curve or rise in the ground. From the depot west, for a distance of four or five hundred feet, there is, in the main tracks, an inclination of about four inches to the hundred feet. The two side tracks, of course, conform very nearly to the grade of the main tracks, being, as one witness testified, slightly lower, for the purpose of drainage. The foreman of the gang who removed these tracks testified that the bed to which he moved this track was very uneven, and he says that in his opinion from the point where the side track No. 2 intersected the lead to the main track, going east, there was a rise of at least twelve inches in a hundred—which would make, as we understand, a rise of about seventy feet to the mile. I should say right here, perhaps, upon behalf of the company, that the general foreman, the man who was the manager of the whole grade, had been subpœnaed and was present at the commencement of the trial in the common pleas, but was called away by a telegram—he was not then in the employ of the company, and he left, and the court declined to wait to enable counsel to get him here, and his evidence was not taken. The station agent testified in the case, in regard to the location of the track and its situation, and he shows that it was substantially situated as I have stated upon the road-bed, and he says that there was a rise at that point, but he is not able to give the exact rise. The assistant engineer had been there a few days before the accident and

was there a short time after the accident. He states in regard to the grade of the main track and as to the grade which was established for this side track; but, of course, he was unable to state from his own observation the exact condition of the road-bed at the time of the accident. He could give it, afterwards, but he was not allowed to state that. He estimates, however, from the position there that the incline from the center of the side track west would be such as that it would be about five inches to the hundres feet, the regular grade being about four inches. That, now, is as near as we can get, from the evidence, the position of the tracks there at the time.

It further appears from the record, that on the previous evening, Topliff's train being due at Vermillion at about 1:45—that late on that evening, probably not far from 11 o'clock, there was a freight train passed to the west, from Cleveland to Toledo, and it stopped at Vermillion and the trainmen set in four cars from the train upon side track No. 2. The first one that went in was empty, and some of the others were loaded, notably the last one was loaded, and, I think, one or two others, with coal. They left the cars there and proceeded on their way west. About one o'clock, or perhaps a little earlier, there was a train came from the west, a freight train, which had received orders to take one of these cars which had been set in by the train going west. For that purpose the train passed down the line of the main track and set a car in upon track No. 1, and then the locomotive and two or three cars backed up onto track No. 2 until it came to these four cars, and was attached to one of these cars and took it and went east until it came down near the junction and then the conductor passed over to the depot for instructions, and just after he got his instructions he waited for the limited train and stepped out upon the platform of the depot and soon saw the headlight of this limited train and signalled it, "all right," as was customary. The semaphore lights were set "all right," too, for the passage of the limited train, and in a moment he heard a concussion made by the accident, and went down to the place of the accident.

The petition which was filed sets up the facts in regard to these matters in a general way and claims that there was an extraordinary and unnecessary rise in the grade at that point at that time. It claims also that the switches were not properly connected, or, rather, perhaps I ought to say "disconnected." I understand from the petition that the claim is that there should have been placed at this point—

Mr. Potter: That there should have been a derailing device.

The Court: Yes, so that if the cars should come down the track at any time instead of going on the main track, they would pass out upon the side of the main tracks. It sets up also that there should have been a watchman at that point, to look after these cars and see that they were properly upon the side track and did not get upon the main tracks.

To this an answer was filed, which is practically a denial of the main points of the plaintiff's petition. It also set up that there was contributory negligence but it was, upon the trial, stated by counsel to the jury that that was not claimed. The point relied upon now, by the railway company, mainly, as I understand, is that the cars which were set in there by the train that went west were run in there, or "kicked" in there, as it is called, and were in charge of the conductor of that train, that he rode in on the car, the rear car, which would be the easterly car when he got in on the side track, and had run in four or five hundred feet upon the side track, he then set the brake, after stopping the train, upon the easterly car; and the claim is that if there was any negligence in the manner in which these cars were taken in there, or in the position of the car upon which the brake was set, it was the negligence of the conductor, which it is claimed would be the negligence of a co-employee of Topliff.

Just the original cause of this accident, is, perhaps, a little hard to determine, from the evidence. The engineer of the west-bound train, whose name was Brady, was not present upon the trial. It was admitted, however, that if he

were present he would testify that he cut off these four cars; that the pin was pulled by his brakeman and that he himself rode in the cars upon the side track, that he set the brake upon the easterly car. There was some testimony tending to show that it was customary to set that brake, upon the car that went in last, that is to say, upon the *westerly* car as they stood upon the side track.

Now, it is argued upon one side that the accident occurred because this east-bound train went in and took this east-bound car, which left the other three cars without being locked—or without the brakes being set upon them; and that thereupon there being an incline at that point—as is claimed, a steep incline—the three cars immediately started westerly and went down towards the main track.

We might as well state right here, that when an examination was made after the accident, by this conductor of the east-bound train and by some other parties, it was found that two of these cars stood upon this side track and the third had passed in upon the main track, and evidently when the locomotive struck that car it broke it from the other two and sent it on down the track in a very damaged condition. An examination was made, of the brakes of the cars, and they were found to be in good condition, the rods and ratchets and gearing, especially upon the west-bound car, the gearing was found to be in good condition, the ratchet was all right and the wheels were all right, but whether the brake was set or not, could not be told. Now while Brady states that he set that brake upon the east-bound car, we think it is not. so certain that he did. There are some things that would tend to militate against that view of the case. The testimony of the conductor of the east-bound train, Gage by name, is, as already stated, that he backed in with the locomotive and three cars. He had one or two assistants with him. He got off the locomotive when it approached these three cars and one or two of his assistants got off and one of them ran down to pull the pin between the two cars, that is, between the east-bound car and the car next to it. His testimony is that as they approached the four cars the train was stopped and one of the brakemen pulled the pin between the two cars, and at the same time another brakeman went in between the approaching car and the west-bound car for the purpose of putting in the pin, and finding no pin there, he called to the other that there was no pin, and the brakeman that pulled the pin between the two cars said he had one, and ran toward the other brakeman with it, but whether or not he used it, or whether he in the meantime had found one, the witness does not remember. They then immediately jumped upon their cars and went away with this one car. Now, the conductor says he has no recollection of loosening any brake on that car, neither has the brakeman, who testifies, and there is no evidence in the record to show that it was loosened. If Conductor Brady is correct in his statement that he set that brake, it would seem that the brakemen would have noticed that the brake was set and somebody would have remembered it. Not only that, but the conductor says that after they loosened the pin they backed upon this car lightly, with less than the usual jar, indeed the engineer stated that he hardly noticed the jar. If these cars had stood upon this incline, which, according to the testimony of the engineer of the company, would be five inches in a hundred feet—and under the testimony of the plaintiff would be more than that—it would seem that the weight of the cars would have made a pull upon the east-bound car and straighten out the connection so that the man who went in there to pull the pin would have had some difficulty in pulling it; and if the testimony is correct that they didn't back up and hit that car and slacken it during that time, the inference would be pretty strong, as claimed by the plaintiff below, that the cars were fastened, not by the east-bound car but by the west-bound car, and that at the time of making the connection the locomotive gave them such a hit or concussion as to start the other three cars, because it is very evident that from the time they hitched to that car and backed out and the conductor went over to the depot within perhaps fifteen or twenty minutes, these cars ran down upon the main track. The conductor says he didn't see the cars start,

and didn't see them ; that he was so situated that he couldn't see them, and, not noticing them, he gave the signal for the limited train to come on.

It is claimed by the plaintiff below, that the blow that was given must have been such as, with the steepness of the grade, to have started these three cars and sent them down towards the main track, and there is a good deal of color to that suggestion. But a question was put to this witness, Gage, as follows : Q. What is the custom and the rule in regard to setting cars in onto the side tracks, as to the opening of the switches and the setting of the brakes, and the closing of the switches? Whose duty is it to see that that is done ? A. The conductor is supposed to see that it is done.

Q. Take a train of cars passing the west switch, and you wanted to put four cars onto the sidetrack No. 2, how would you do it? A. Put them in there and leave the brake set on the west end of them; and if the brake was not good, to leave the wheels blocked.

Well, that would be the rule for the west end. If they had performed the same duty to the four cars left there, it would leave the cars so that when they took away the lower car the other three might follow ; and even so with the west end, perhaps. The fact is that so far as the evidence is concerned—and there is where we find the greatest difficulty with the defendant's case—that there is no evidence here going to show any rule on the part of the company itself as to what shall be done in regard to these cars which are set in upon a sidetrack, where there is an incline, or where there is not, for that matter—the company seem to have placed their defense in this case entirely upon the proposition that Brady was the negligent party and that he was a co-employee of the plaintiff—Topliff, and therefore there was no liability on the part of the railway company.

The testimony of Mr. Newell, the president of the road, was taken, but he gives no evidence except as to the various departments of the system and who are the heads of departments. We think the liability of the company arises from the fact that it is not shown here that there had been any such rules or regulations made by the company itself, as a rule regulating the company, for the conduct of its subordinates, in regard to the method and manner in which these cars which were set in upon the sidetrack should be fastened and secured or kept in order to protect the employees, the brakemen upon the trains and the passengers upon the road. We think the jury might have been justified in finding here that this train was fastened at the west end, as it is claimed by the railway company that it should have been fastened, and that still there was such a defect in the fastening, and such a defect in the failure of the company to give any rules in regard to it, as might justify the jury in finding that the defendant would be liable for any accident that occurs from the cars getting upon the main track. The fact is that the company had been making these changes in the location of these tracks and it had left the track in an imperfect condition upon this grade—the grade itself was not perhaps fully established. There was no evidence that the filling conformed to the grade which had been established by the engineer or at which he expected it to be put. The evidence shows upon all hands that the track itself had not been put down to the position in which it was ultimately intended to be put, and there was nothing to show that the railroad company had given any directions or taken any steps to guard the public who might be traveling in its passenger trains, or to guard the employees upon their trains, from an accident which might occur in the manner in which this did occur. There was nothing said or nothing done. It is claimed, indeed, by the plaintiff that there should have been a man put there to guard this track at that time, at least until it was finished; but, whether there was, or was not—we do not think it was absolutely necessary. But we think there should have been some rules and regulations established by the company for the control and protection of just that kind of work during the time it was being done, as well as the tracks which stand upon an inclined plane after they are finished, to protect and secure the cars

which are there placed. We find that the company have failed to do that, so far as this record discloses. While the conductor says that it was expected that the conductors would do that, who expected it and in what way it was expected and for what reason it was expected, is not shown. It is not shown that they ever had any orders given in any manner or form in regard to the matter.

Exceptions were taken to the charge of the court. The charge of the court was given in this manner—after stating the issues between the parties, the court said to the jury:

"If, however, you are satisfied that the plaintiff was injured, as charged, and that this injury was occasioned by negligence pointed out by the plaintiff in his petition upon the part of the defendant—if the proof satisfies you of this and you are enabled to find it by a preponderance of the evidence, then you will pass to the consideration of the second issue in this case; and that is conceded, as we understand—not insisted on now—and it remains therefore simply to determine whether the plaintiff has proved his injuries to have resulted from negligence pointed out by him in his petition against the defendant, and if you find that he has not, your verdict will be for the defendant. If you find that the plaintiff was injured, as claimed, and that these injuries resulted from the negligence complained of by the plaintiff, then your verdict should be for the plaintiff."

It will be observed that that does not attempt to enter into any instruction in regard to the duties of the railroad company.

The plaintiff made a single request. The defendant then made five requests. The court gave four of the defendant's requests, and gave the request of the plaintiff. We think those requests might be the subject of some criticism, but upon the facts of the case, as stated in the record, that there is no error in the charges given such as call for a reversal of the judgment. If there had been any evidence upon the rules, in the case, the plaintiff's request to charge, in our judgment, would have been erroneous.

It has been suggested to the court that the verdict was too large—was excessive. The verdict is $19,000. It is shown, as already stated, that Topliff at that time was 43 years old; he was in good health and strength and bid fair to live as long as the average of men. It is shown that his injuries are such as will last him all of his life—are severe and permanent and will disable him from labor probably all his life. It was shown that he was a first-class engineer. It was his first accident in the whole twenty-eight years he had been employed by the company. It was also shown that he was making $110 a month, or $1,320 a year. Assuming that he would have been able to pursue his occupation for the average length of life, by the Carlisle tables the present worth of his life would have been over $15,000. It is probable that he might at some time have been disabled by sickness, but assuming that he had gone on until he was sixty years old, his earnings would have been large, and perhaps nearly as much as this verdict. It is shown that he suffered a great deal of pain; he was ill a great many weeks—and I think months—at the hotel at Vermillion, and then he was brought home and has been and still is a sufferer from these injuries, and these sufferings were intense for a long time. We have never had a case exactly like this before, where the injuries were substantially the same as this man's. We did, however, have a case of this kind where a verdict was rendered for $30,000, and we cut it down to $20,000, based simply upon the Carlisle tables, and based it of course upon the earning capacity of the party. The verdict is large, larger, perhaps, than we would have rendered ourselves, but we hardly know, if we should go to work to require a remitter upon this judgment, where we would commence or where end. It is a pretty difficult thing to say what a party ought to have, and we cannot say, under the rules of law which should govern us, in passing upon the case, that the amount of this verdict is excessive. We are hardly prepared to say, upon our own judgment, that it was excessive. The sufferings the man had to endure were very great, and we

think considerable allowance should be made for that. The earning capac-
ities of the man were excellent and his health and prospects were good. If we
follow the Carlisle tables in regard to this matter, even if we make allowance
for prospective sickness or matters of that kind, still we could hardly say that the
judgment was largely excessive at any rate, not so excessive as to war-
rant us in interfering with it. We are of opinion, upon the whole, that the judg-
ment of the court should be affirmed, and reasonable ground certified, so that
there will be no penalty, and the plaintiff in error will be adjudged to pay the
costs of the suit.

Thereupon the plaintiff in error, by its counsel, duly excepted.

*E. D. Potter, Jr.*, for Plaintiff in Error.

*Hurd & Scribner*, for Defendant in Error.